No. 24-1899

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Thomas Joseph Powell, Barry D. Romeril, Christopher A. Novinger, Raymond J.
Lucia, Marguerite Cassandra Toroian, Gary Pryor, Joseph Collins, Rex Scates,
Michelle Silverstein, Reason Foundation, Cape Gazette, Ltd.,
and the New Civil Liberties Alliance,
*Petitioners*,
v.
United States Securities and Exchange Commission,
*Respondents.*

On Petition for Review
from the United States Securities and Exchange Commission
No. 4-733

**Brief of *Amicus Curiae*
Hamilton Lincoln Law Institute
In Support of Petition for Rehearing**

HAMILTON LINCOLN LAW INSTITUTE
Adam E. Schulman
1629 K Street NW, Suite 300
Washington, DC 20006
(610) 457-0856
adam.schulman@hlli.org

# Table of Contents

Table of Contents ..................................................................................... i

Table of Authorities ................................................................................ ii

Interest of *Amicus Curiae* ....................................................................... 1

Federal Rule of Appellate Procedure 29 Statement ............................... 1

Summary of Argument ............................................................................. 1

Argument ................................................................................................. 3

I.     The SEC's blanket Gag Rule serves no legitimate government interest............. 3

II.    A comparison to private civil class action settlements demonstrates the unwarranted nature of the SEC's Gag Rule. ....................................... 12

Conclusion ............................................................................................... 15

Certificate of Compliance  Pursuant to 9th Circuit Rule 32-1 for Case Number 24-1899 .......................................................................... 16

Proof of Service ...................................................................................... 17

# Table of Authorities

Cases

*Acosta v. Cathedral Buffet, Inc.*,
   887 F.3d 761 (6th Cir. 2018) ............................................................ 4

*Am. Beverage Ass'n v. City of San Francisco*,
   916 F.3d 749 (9th Cir. 2019) (*en banc*) ...................................... 14

*Apter v. HHS*,
   80 F.4th 579 (5th Cir. 2023) ........................................................ 14

*Axon Enter., Inc. v. FTC.*,
   598 U.S. 175 (2023) ...................................................................... 10

*Briseño v. Henderson.*,
   998 F.3d 1014 (9th Cir. 2021) ...................................................... 12

*Carlson v. Xerox.*,
   No. 00-cv-01621-AWT (D. Conn) ............................................ 12-13

*Cato Institute v. SEC*,
   4 F.4th 91 (D.C. Cir. 2021) .......................................................... 11

*Competitive Enter. Inst. v. FCC*,
   970 F.3d 372 (D.C. Cir. 2020) .................................................... 1, 4

*Davies v. Grossmont Union High Sch. Dist.*,
   930 F.2d 1390 (9th Cir. 1991) ................................................*passim*

*Edenfield v. Fane*,
   507 U.S. 761 (1993) ........................................................................ 3

*First Nat'l Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978) ........................................................................ 8

*Greenberg v. Haggerty*,
   491 F. Supp. 3d 12 (E.D. Pa. 2020) .............................................. 1

*Houston Cmty. Coll. Sys. v. Wilson*,
   595 U.S. 468 (2022) ........................................................................ 5

*Leonard v. Clark,*
    12 F.3d 885 (9th Cir. 1993) ........................................................................ 7

*Matal v. Tam,*
    582 U.S. 218 (2017) ................................................................................... 4

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ............................................................................ 12, 14

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    585 U.S. 755 (2018) .................................................................................. 14

*Nat'l Rifle Ass'n v. Vullo,*
    144 S. Ct. 1316, 218 L. Ed. 2d 642 (2024) ................................... 9-10, 11

*New York Times v. Sullivan,*
    376 U.S. 253 (1964) ................................................................................... 6

*Overbey v. Mayor of Baltimore,*
    930 F.3d 215 (4th Cir. 2019) ........................................................ 4, 5-6, 9

*Pickering v. Bd. of Educ.,*
    391 U.S. 563 (1964) ................................................................................ 4-5

*Riley v. National Federation of the Blind,*
    487 U.S. 781 (1988) ................................................................................... 3

*SEC v. Citigroup Global Mkts.,*
    827 F. Supp. 2d 328 (S.D.N.Y. 2011) .................................................... 13

*SEC v. Novinger,*
    40 F.4th 297 (5th Cir. 2022) .................................................................... 11

*SEC v. Novinger,*
    96 F.4th 774 (5th Cir. 2024) .................................................................... 11

*SEC v. Romeril,*
    15 F.4th 166 (2d Cir. 2021) ..................................................................... 11

*SEC v. Vitesse Semiconductor Corp.,*
    771 F. Supp. 2d 304 (S.D.N.Y. 2011) ................................................ 13-14

*Simon & Schuster, Inc v. Members of the N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991) ................................................................................ 11

*Snyder v. Phelps*,
  562 U.S. 443 (2011) .................................................................................. 5

*Stock v. Gray*,
  663 F. Supp. 3d 1044 (W.D. Mo. 2023) .................................................... 1

*Thunder Studios, Inc. v. Kazal*,
  13 F.4th 736 (2021) ............................................................................... 7-8

*Town of Newton v. Rumery*,
  480 U.S. 386 (1987) ........................................................................ 6, 7, 9

*United States v. Alvarez*,
  567 U.S. 709 (2012) ...................................................................... 3, 5, 15

*United States v. ITT Cont'l Baking Co.*,
  420 U.S. 223 (1975) .................................................................................. 3

*USAID v. Alliance for Open Soc'y Int'l*,
  570 U.S. 205 (2013) .................................................................................. 4

*Va. State Bd. v. Va. Citizens Consumer Council.*,
  425 U.S. 748 (1976) ............................................................................ 14-15

*Whitney v. California*,
  274 U.S. 357 (1927) ................................................................................ 15

Rules and Statutes and Constitutional Provisions

17 C.F.R. 202.5(e) ....................................................................... 8, 13, 15

17 C.F.R. pt. 10, App. A .................................................................... 13

Fed. R. App. P. 29(a)(4)(e) ................................................................... 1

U.S. Const. Amend I. ................................................................. *passim*

<u>Other Authorities</u>

Ginsburg, Douglas H. & Joshua D. Wright, *Antitrust Settlement: The Culture of Consent*,
in 1 WILLIAM E. KOVACIC, AN ANTITRUST TRIBUTE (2013)............................. 10

## Interest of *Amicus Curiae*

Hamilton Lincoln Law Institute ("HLLI") is a public interest organization dedicated to protecting free markets, free speech, limited government, and separation of powers against regulatory abuse, overreach, and rent-seeking. *See, e.g., Competitive Enter. Inst. v. FCC*, 970 F.3d 372 (D.C. Cir. 2020) (challenge to federal regulatory overreach); *Stock v. Gray*, 663 F. Supp. 3d 1044 (W.D. Mo. 2023) (enjoining regulation that infringed pharmacist free speech); *Greenberg v. Haggerty*, 491 F. Supp. 3d 12 (E.D. Pa. 2020) (enjoining regulation that infringed attorney free speech).

*Amicus* files this brief in support of rehearing and the petitioners' request to order the SEC to engage in rulemaking to remove the language imposing the Gag Rule from its regulations.

## Federal Rule of Appellate Procedure 29 Statement

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* affirms that no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than *amicus*, its members, or its counsel has made any monetary contributions intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief under Cir. R. 29-2(a).

## Summary of Argument

HLLI shares Petitioners' conclusion: the SEC regulation that demands all consent decrees include a lifetime prohibition of any statement that might cast doubt

on the merit of the SEC's case (the "Gag Rule") violates bedrock First Amendment principles.

The SEC lacks any legitimate government interest in the use of this Gag Rule both because the justifications it has set forth are insufficient and because, even if credited, several less restrictive means exist to protect those stated interests. The SEC's denial letter extols settlement, but neglects this Court's teaching that such a "general interest" is "insufficient" to "outweigh a substantial public interest" that accompanies the exercise of certain constitutional rights. *Contrast* ER 59-60, *with Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1398-99 (9th Cir. 1991). While the SEC frets that free speech would create a misimpression and undermine public confidence, this Court recognizes such paternalistic impulses as a "pernicious" distortion of the political process. *Contrast* ER 58-59, *with Davies*, 930 F.2d at 1398-99.

The Gag Rule also fails because *Davies* requires that the government show a specific interest in the context of each "particular agreement," yet the SEC's only justifications for its inflexible Gag Rule are general, not case-specific. *See* 930 F.2d at 1399. Had the SEC followed *Davies*, it could not have sustained its blanket gag policy. Nor could the panel have ratified that decision. Instead, the SEC did not even mention the "substantial public interest" in the free flow of information or the fact that third parties (like the press petitioners here) themselves have First Amendment rights to receive information. And the panel turns *Davies* on its head by insisting petitioners justify a "facial-type challenge," rather than holding the government to its case-by-case obligation. Slip. Op. 5, 22, 27, 29.

Nor does the nature of consent decrees in practice demand anything like a no-admit/no-deny requirement. Private civil class settlements, including one arising out of Petitioner Romeril's alleged wrongdoing, evidence the unwarranted nature of the SEC's Gag Rule. Almost no other enforcement agency has adopted the SEC's speech-suppressive practice. ER-62 & n.18 (dissenting statement of Commissioner Peirce).

The Court should take this opportunity to reaffirm *Davies* and cease the SEC's continued unconstitutional practice of restricting protected speech on a blanket basis.

## Argument

## I.   The SEC's blanket Gag Rule serves no legitimate government interest.

"[T]he First Amendment does not permit the State to sacrifice speech for efficiency." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988). Nor does it acquiesce to abstract, theoretical, prophylactic, or undifferentiated governmental concerns. *E.g., United States v. Alvarez,* 567 U.S. 709, 726-27 (2012); *Edenfield v. Fane*, 507 U.S. 761, 774 (1993). Yet the SEC's justifications for its Gag Rule only suggest an amorphous need for the SEC to compromise and settle its investigations to conserve resources and a desire to avoid "some sort of battle by press release." Brief for Plaintiff-Appellee at 37, *SEC v. Romeril*, No. 19-4197 (2d Cir. Jul. 10, 2020); *accord* ER-58 ("the Commission does not try its cases through press releases."). Neither amounts to a legitimate justification for restricting the flow of information.

Of course, the SEC may enter consent decrees to conserve resources; no one disputes that. *See, e.g., United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 235 (1975). But that is not the issue. Rather, the issues are (1) may the SEC impose a specific condition

within that consent decree—a provision forever binding defendants from denying the allegations against them—that it could not obtain in litigation, thus preventing the public from receiving that information? And (2) does a blanket regulation requiring a gag order for all SEC consent decrees, ignoring case-specific circumstances, accord with free-speech principles? Both answers are no. *See Davies*, 930 F.2d at 1398-99.

It is not enough for the government to show that enforcement defendants "consent" to the gag order. The government must show the condition at least bears some "plausible relation" to a legitimate public interest to impose a condition restricting a constitutional right. *Matal v. Tam*, 582 U.S. 218, 253 (2017) (Kennedy, J., concurring); *USAID v. Alliance for Open Soc'y Int'l*, 570 U.S. 205, 214-15 (2013); *cf. also Overbey v. Mayor of Baltimore*, 930 F.3d 215, 223 (4th Cir. 2019). Without such a relation, "non-germane conditions" may amount to "'an out-an-out plan of extortion.'" *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 387 (D.C. Cir. 2020) (quoting *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987)). In effect, if obtaining consent was sufficient, then an agency could shoehorn unbounded authority into its consent decree power. Courts customarily reject any "conceit of unlimited agency power." *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 770 (6th Cir. 2018) (Kethledge, J., concurring). Thus, it's no answer for the panel to rely on safeguards that consent be "knowing," "voluntary," and intelligent." Slip. Op. 22-23.

The interests that the Gag Rule *does* serve are not legitimate public interests. There is no legitimate public interest in suppressing otherwise protected speech simply because it criticizes or embarrasses the government. *E.g., Pickering v. Bd. of Educ.*, 391 U.S. 563, 570 (1964) ("to the extent that the Board's position here can be taken to

suggest that even comments on matters of public concern that are substantially correct … may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it"). "The right to 'examin[e] public characters and measures' through 'free communication' may be no less than the 'guardian of every other right.'" *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022) (quoting Madison's Report on the Virginia Resolutions (Jan. 7, 1800), in 17 Papers of James Madison 345 (D. Mattern, J. Stagg, J. Cross, & S. Perdue eds. 1991)). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotation omitted).

Nor does the SEC have a valid interest in "avoid[ing] the confusion and credibility issues that would result if a defendant could settle one day and deny the next." Brief for Plaintiff-Appellee at 42-43, *SEC v. Romeril*, No. 19-4197 (2d Cir. Jul. 10, 2020); *accord* ER-58 ("that turnabout can negatively impact the public interest"). Open discussion of criminal enforcement, prosecution, and settlement practices undertaken by government agencies is of the utmost public interest and cannot be fairly conducted with one side silenced. The marketplace of ideas only flourishes with "[f]ree speech on both sides and for every faction on any side." *Houston Cmty. Coll. Sys.*, 595 U.S. at 477 (quoting *Thomas v. Collins*, 323 U.S. 516, 547 (1945) (Jackson, J., concurring)). As public servants, agencies must live with the reality that free speech may "undermine confidence in the Commission's enforcement program." ER-59 "Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Alvarez*, 567 U.S. at 728. "Enforcing a waiver of First Amendment rights

for the very purpose of insulating public officials from unpleasant attacks would plainly undermine that core First Amendment principle." *Overbey*, 930 F.3d at 226; *cf. also New York Times v. Sullivan*, 376 U.S. 254, 273 (1964) ("If judges are to be treated as men of fortitude, able to thrive in a hardy climate, surely the same must be true of other government officials.") (internal quotation omitted).

The panel recognizes that it "would be improper" "to silence defendants in order to promote public confidence in the SEC's work." Slip Op. 26. Yet it concludes that the SEC's interest is not "wholly illegitimate" because it retains "some interest in determining how to try its cases and prove its allegations" and imposing its "preferred enforcement strategy." Slip Op. 25. But this Court has already held that the government's "general interest" in resolving cases via settlement is "insufficient" to "outweigh a substantial public interest" that accompanies the exercise of certain constitutional rights. *Davies*, 930 F.2d at 1398-99; *accord Town of Newton v. Rumery*, 480 U.S. 386, 393 (1987) ("[A] promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."). The Fourth Circuit agrees. *Overbey*, 930 F.3d at 225.

Because the SEC's Gag Rule compromises the public marketplace of ideas, "the party seeking enforcement must, at the least, advance some important interest in addition to the interest in settlement." *Davies*, 930 F.3d at 1398. And the government must advance that interest on a case-by-case, litigation-by-litigation basis. *Id.* at 1399. In other words, the government must connect a "specific interest the government seeks to advance" with a "specific right waived." *Id.* It must do so with respect to the

circumstances of each "particular agreement." *Id.* Generalized interests will never do. *Contra* Slip Op. 25-26.

The SEC's blanket Gag Rule violates *Davies* and *Rumery* by disallowing consideration of each "particular agreement." Regardless of whether an enforcement attorney concludes that justice would be served by declining to impose a gag against a particular defendant in a particular action, the Gag Rule demands it as a condition of *any* settlement. No exceptions. Doing such, the SEC imposes an across-the-board harm to the marketplace of ideas that otherwise "could not have been affected by a resolution of the litigation." *Davies*, 930 F.2d at 1399.

The panel ignores the inflexibility of the Gag Rule, instead focusing on its supposedly closer resemblance to the waivers in *Leonard* and *Rumery* than that in *Davies*. Slip. Op. 25. But the Gag Rule fares poorly on any comparison; in all three cases, at least the government enforced waivers on a case-specific basis. Least apt is *Leonard v. Clark*, a pre-*Janus* labor law case involving a single collective bargaining agreement with a waiver "originally proposed" by the plaintiff. 12 F.3d 885, 890 (9th Cir. 1993). Beyond the waiver, *Leonard* "expressly decline[d]" to decide whether the clause at issue even "implicate[d] [the plaintiff's] First Amendment rights at all." *Id.* at 889. Here, everyone agrees that the Gag Rule suppresses speech.

Like the right to run for office, the right to speak "implicates the public interest." *Davies*, 930 F.2d at 1398. Whenever the SEC curbs a settling defendant's right to speak, it "results in a limitation on the fundamental right" of each citizen to hear and receive information from that defendant. *Id.* "The First Amendment protects speech for the sake of both the speaker and the recipient." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736,

743 (9th Cir. 2021). Put simply, the government may not "control the flow of ideas to the public." *Id.* at 744 (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 302 (1965)). But this is the SEC's stated aim in gagging defendants. The SEC's stated policy for its Gag Rule is "to avoid creating, or permitting to be created, an impression that a decree is being entered or a sanction imposed, when the conduct did not, in fact, occur." 17 C.F.R. 202.5(e); *accord* ER-56, 58-59. As members of the press, Petitioners Delaware Free Press and Reason Foundation suffer a First Amendment violation because of their inability to receive the gagged defendants' reflections on the SEC. No one could claim they consented to the waiver of their rights.

The SEC's "pernicious" paternalistic rationale subverts self-government: "democratic government is premised on the proposition that the people are the best judges of their own interests." 930 F.2d at 1398. "To treat political rights as economic commodities corrupts the political process." *Id.* The SEC's attempt to "shield[]" itself "from criticism"[1] resembles the *Davies* officials' efforts to "perpetuate themselves in office and to burden the rights of those who would oppose them." *Davies*, 930 F.2d at 1399. Both dynamics "are offensive to basic democratic principles." *Id.* Our Constitution "entrust[s]" "the people" "with the responsibility for judging and evaluating the relative merits of conflicting arguments"—not the government. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 791-92 (1978). Preventing settling defendants—*i.e.*, those with well more intimate knowledge of the SEC than the average citizen—from speaking about their experience with the SEC removes crucial voices

---

[1] ER-63 (dissenting statement of Commissioner Peirce).

from the nation's important conversations about public affairs. ER-63-64 (dissenting statement of Commissioner Peirce). The government seeks to shut down the civic participation of its adversaries—"countless potential speakers" instead of just Mr. Davies. ER-64 (dissenting statement of Commissioner Peirce). Simultaneously, the government collaterally damages even more citizens, impeding them from listening, deliberating, and reaching their own independent judgments.

Moreover, "[t]he absence of a close nexus will ordinarily show that the government is seeking a waiver of important rights without a legitimate governmental interest that justifies doing so." *Davies*, 930 F.2d at 1398-99. Here, the SEC's Gag Rule lacks any tailoring to the SEC's purported aim of "minimiz[ing] litigation risk, maximiz[ing] limited resources, and accelerating the resolution of the case." ER-60. A policy of mandating one specific non-negotiable term—a gag order—makes settlement more difficult, not less! It does nothing to protect the public fisc. *Contrast Rumery*, 480 U.S. at 393 (civil claims waiver safeguards public funds). Again, a "general interest in using settlement agreements to expedite litigation is not enough" to justify a condition that restricts a defendant's speech going forward. *Overbey*, 930 F.3d at 225; *accord Davies*, 930 F.2d at 1399. The SEC's "more mechanical" interest in proving its allegations in court ceases to be legitimate when it becomes contingent on the out-of-court public statements of a defendant. *Contra* Slip Op. 26.

Because the SEC has no power to impose speech restrictions directly, it has smuggled them in through the backdoor of its enforcement action settlement authority. By the SEC's lights, the imposition is voluntary: "a defendant is always free to eschew settlement and litigate." ER-57. Presto! The agency can now do "indirectly what [it] is

barred from doing directly." *Contra Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024). But a Hobson's choice isn't a real choice. In reality, "[c]onsent decrees create potential for an enforcement agency to extract from parties under investigation commitments well beyond what the agency could obtain in litigation." Douglas H. Ginsburg & Joshua D. Wright, *Antitrust Settlement: The Culture of Consent*, in 1 WILLIAM E. KOVACIC, AN ANTITRUST TRIBUTE 177 (N. Charbit et al. eds. 2013). This is because "few can outlast or outspend the federal government." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 216 (2023) (Gorsuch, J., concurring in the judgment). Therefore, almost every defendant has no choice but to settle and accept a gag order since it is the "only economically viable option to resolve enforcement actions." ER-63 (dissenting statement of Commissioner Peirce). So, it is no surprise that the SEC settles as many as 98% of its enforcement actions. ER-49. What results is a government commission forcing all but the wealthiest defendants into silence.

Thus, the SEC's enforcement authority has turned into an *in terrorem* tool to impose speech-suppressing terms that it "could not lawfully obtain any other way." *Axon Enter.*, 598 U.S. at 216 (Gorsuch, J., concurring in the judgment); *accord* ER-63 (statement of dissenting Commissioner Peirce). The First Amendment does not normally accept "a strategy [that] allows government officials to expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over." *Nat'l Rifle Ass'n*, 602 U.S. at 197-98.

The panel found that "on its face," the Gag Rule "is a relatively narrow limitation on speech," expressing concern that "every waiver of First Amendment rights can in some sense be described as a content-based prior restraint." Slip Op. 22, 26. But

petitioners aren't challenging every individual waiver; they are challenging an indiscriminate policy dictating that all consent decrees must contain a waiver. The "as-applied" type challenges that the panel contemplates (Slip Op. 6, 13, 28-29) offer petitioners only false hope. Specifically, the panel does not observe the procedural obstacles that have continuously stymied efforts to combat the Gag Rule in particular enforcement actions. *See SEC v. Novinger*, 96 F.4th 774 (5th Cir. 2024) (lack of declaratory judgment motion); *SEC v. Novinger*, 40 F.4th 297 (5th Cir. 2022) (lack of Rule 60 avenue); *SEC v. Romeril*, 15 F.4th 166 (2d Cir. 2021) (same); *Cato Institute v. SEC*, 4 F.4th 91 (D.C. Cir. 2021) (lack of Article III standing to sue SEC).

In that earlier litigation, the SEC faulted petitioners for "rhapsodiz[ing]" about the "truth" and "public discourse" and for their role in accepting the consent decree. Brief for Plaintiff-Appellee at 47, *SEC v. Romeril*, No. 19-4197 (2d Cir. Jul. 10, 2020). But, regardless of an enforcement defendant's acquiescence, a federal agency must always seek to further the public interest. And here, the First Amendment instructs that the public interest consists in maximizing the free flow of information available in the marketplace of ideas. *See, e.g., Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (refusing to allow New York to "drive" speech depicting past crime "from the marketplace"). Even if a gag order might serve valid interests in certain circumstances and certain cases, the SEC's blanket rule definitely does not. *See Davies*, 930 F.2d at 1399.

## II. A comparison to private civil class action settlements demonstrates the unwarranted nature of the SEC's Gag Rule.

When a regulation is unprecedented, that "raise[s] concern" that the government "has too readily forgone options that could serve its interest just as well, without substantially burdening the kind of speech in which petitioners wish to engage." *McCullen v. Coakley*, 573 U.S. 464, 490 (2014). Looking at the landscape of both government enforcement practice and private shareholder class settlements reveals just how much of an outlier the Gag Rule is.

In *amicus* HLLI's experience reviewing thousands and objecting to over a hundred private "no admit" class-action settlements,[2] it is aware of **zero** settlements that enjoin the defendant from commenting publicly on the merits of the plaintiffs' allegation. Quite to the contrary, private settlements typically put the defendants' denial of the veracity of the claim directly into the agreement's recitals. For example, in the parallel private action arising out of the same events at issue in Mr. Romeril's enforcement action, the unequivocal denial came right in the settlement agreement:

> The Defendants have denied and continue to deny any wrongdoing whatsoever and this Stipulation, whether or not consummated, any proceedings related to any settlement, or any terms of any settlement, whether or not consummated, shall in no event be construed or be deemed to be evidence of an admission or concession on the part of any Defendant with respect to any claim or [sic] of any fault or liability or wrongdoing or damage whatsoever.

---

[2] HLLI's Center for Class Action Fairness is the nation's leading organization in advocating for class member rights, having overturned dozens of unfair private class action settlements in this Circuit alone. *See, e.g., Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021).

*Carlson v. Xerox Corp.*, No. 00-cv-01621-AWT, Dkt. 463 at 2 (D. Conn. Mar. 27, 2008). Again, this language is routine and typical, yet the sky has not fallen. With the SEC's Gag Rule, we arrive at an upside-down situation where private plaintiffs, with no duty under the First Amendment, are more solicitous of the marketplace of ideas than is a federal agency. Put simply, even if one could view the SEC as a market participant engaged in the enterprise of settling litigation, there is no legitimate interest in imposing a prospective speech ban on defendants.

By comparison to other public agencies too, the SEC's Gag Rule is an aberration. ER-62 & n.18 (dissenting statement of Commissioner Peirce). As far as *amicus* is aware, only the U.S. Commodity Futures Trading Commission has a similar policy as part of enforcement action settlements. *See* 17 C.F.R. pt. 10, App. A. Moreover, if it is the genuine policy of the SEC to "avoid creating, or permitting to be created, an impression that a decree is being entered or a sanction imposed, when the conduct alleged did not, in fact, occur" (17 C.F.R. § 202.5(e)), then the Commission's willingness to enter into settlements without admission of liability makes little sense. Indeed, the Commission is not only willing to enter into "no admit" settlements, but it also insists on them even when presiding courts try to hold them to that policy. *See SEC v. Citigroup Global Mkts. Inc.*, 827 F. Supp. 2d 328 (S.D.N.Y. 2011), *rev'd* 752 F.3d 285, 295 (2d Cir. 2014). Whether or not such insistence on "no admit" consent decrees is a good idea, *Citigroup* undermines the notion that the SEC's Gag Rule only aims to combat public confusion.

In practice, the SEC's no-admit/no-deny approach has *created* "a stew of confusion and hypocrisy." *SEC v. Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 304, 309 (S.D.N.Y. 2011) (Rakoff, J.). After a no-admit/no-deny settlement, "[o]nly one thing is

left certain: the public will never know whether the S.E.C.'s charges are true, at least not in a way that they can take as established by these proceedings." *Id.* The idea of avoiding "confusion" cannot rationalize the unconstitutional prior restraint.

Besides gag orders, there are alternative means to combat fears that later denials would undermine the SEC's mission and credibility. After all, the government may never unnecessarily infringe on free speech rights to solve its problems. *See McCullen*, 573 U.S. at 486. First, it could "make sure that settlements are rooted in fact,…fairly negotiated,…and legally sound" from the outset. ER-64 (dissenting statement of Commissioner Peirce). Second, despite mocking the idea of "some sort of battle by press release" between itself and a defendant publicly denying the allegations against him, the SEC offers no actual rationale for why it cannot use its own public speech to avoid embarrassment and confusion, as other agencies do. A "public information campaign" is the "obvious[]" solution to a problem of educating the public. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 775 (2018); *accord Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (*en banc*) (Ikuta, J., concurring in the result) (noting that public information campaign is less burdensome than compelling speech). Federal agencies have "plenty of statutory authority" allowing them to issue information to the public. *Apter v. HHS,* 80 F.4th 579, 589 (5th Cir. 2023). If a defendant's public denials truly risk the SEC's credibility, the SEC could easily publicize its own account of the factual and legal case it had against the defendant and describe its rationale for seeking a consent order rather than trying its case. In that situation, the public would receive both sides of the story and be able to assess for itself what it believes to be the truth. But instead of "open[ing] the channels of communication"—

"the best means" of enlightening the public—the SEC instead chose the "highly paternalistic approach." *Va. State Bd. v. Va. Citizens Consumer Council*, 425 U.S. 748, 770 (1976).

As it stands now, the public is left with only the SEC's word that it undertakes its investigative and prosecutorial decisions in the manner most conducive to advancing the public interest. For nearly 100 years, courts have reiterated that the best defense to potential or actual falsehoods is more speech, not restricting speech: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J, concurring); *see also Alvarez*, 567 U.S. at 719-20. More speech is the solution here too, not universal gag orders.

## Conclusion

For too long the SEC's unconstitutional gag orders have silenced American citizens and thwarted the free flow of information to members of the public. This Court should grant rehearing to grant the petition for review and order the SEC to eliminate the unconstitutional provisions of 17 C.F.R. 202.5(e).

Dated: October 1, 2025                     Respectfully submitted,

*/s/ Adam E. Schulman*
HAMILTON LINCOLN LAW INSTITUTE
Adam E. Schulman
1629 K Street NW, Suite 300
Washington, DC 20006
(610) 457-0856
adam.schulman@hlli.org

**Certificate of Compliance**
**Pursuant to 9th Circuit Rule 32-1 for Case Number 24-1899**

I certify that: This brief complies with the length limits permitted by Ninth Circuit Rules 32-1 and 29-2(c)(2). The brief is 4188 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Executed on October 1, 2025.

/s/ *Adam E. Schulman*
Adam E. Schulman

**Proof of Service**

I hereby certify that on October 1, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.


*/s/ Adam E. Schulman*
Adam E. Schulman